Richard D. CARTWRIGHT,
Plaintiff–Appellant,

v.

LOCKHEED MARTIN UTILITY
SERVICES, INC., Defendant–
Appellee.

No. 00–6671.

United States Court of Appeals,
Sixth Circuit.

July 3, 2002.

Before GUY, Senior Circuit Judge and BATCHELDER, Circuit Judge; WALTER, District Judge.*

PER CURIAM.

Plaintiff, Richard D. Cartwright, appeals from entry of summary judgment in favor of his employer, Lockheed Martin Utility Services, Inc. (LMUS), with respect to his claims of race discrimination, disability discrimination, and retaliation for filing an EEOC charge, which were brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), and the Americans with Disabilities Act (ADA) of 1990, 42 U.S.C. § 12112(a).[1] Plaintiff argues that

---

* The Honorable Donald E. Walter, United States District Judge for the Western District of Louisiana, sitting by designation.

1. The district court also granted summary judgment on plaintiff's claim of disability discrimination under the Kentucky Civil Rights Act, Ky.Rev.Stat. § 344.101, *et seq.*, for the same reasons as the ADA claim. *See Brohm v. JH Props., Inc.*, 149 F.3d 517, 520 (6th Cir.1998) (Ky. statute mirrors ADA). Plaintiff has abandoned this claim, however, by failing to argue it on appeal. *Kocsis v. Multi–Care Mgmt., Inc.*, 97 F.3d 876, 881 (6th Cir.1996) (although notice of appeal was from the entire judgment, appellant waived all arguments not raised in the brief on appeal).

the district court erred in finding (1) that he was not disabled as defined by the ADA; (2) that he did not suffer materially adverse employment actions culminating in his constructive discharge; (3) that he failed to establish a *prima facie* case of race discrimination; and (4) that he was unable to show a causal connection between protected activity and an adverse employment action. After review of the record and the arguments presented on appeal, we affirm.

## I.

In 1974, plaintiff, an African–American male, began working at Paducah Gaseous Diffusion Plant, which enriches uranium for use in atomic reactors.[2] A graduate of the Institute of Electronic Technology in Paducah, plaintiff quickly transferred into the instrument shop and worked as an instrument mechanic until he applied for short-term disability benefits in January 1999. The district court summarized the relevant facts as follows:

> During most of the last decade, Plaintiff worked as an instrument mechanic operating photohelic instruments, which are flow gauges used to measure the flow of liquids involved in the processes at the plant. Plaintiff sat at a workbench to repair devices. He spent approximately half of his time at a bench and half of his time at other work stations in the instrument mechanic room. Plaintiff's immediate supervisor for several years ha[d] been Stan Jones, an African American. In 1996, Randy Cothron became Jones's supervisor. Jones and Cothron shared offices close to Plaintiff's work station.
>
> Plaintiff received a work-related injury in 1992. His condition became worse and he had neck surgery in June 1995. After the surgery, he worked with a 10

to 30 pound lifting restriction. At the present time, Plaintiff has no working restrictions related to his neck condition. He received a workers' compensation settlement of 12% partial disability. In fall 1996, Plaintiff claims that he requested reasonable accommodations to assist him with his work. He claimed that his neck pain required him to raise his workbench and to obtain a special chair. Jones obtained a block of wood to raise Plaintiff's work station, but Plaintiff was not satisfied because the block of wood required some positioning [and was too heavy for him to comfortably move.] The company conducted an ergonomics test in 1996, which Plaintiff found unsatisfactory. Plaintiff claimed that he continued to work in pain, and his productivity declined. Supervisor Jones criticized Plaintiff for his poor productivity. However, Plaintiff did not receive any disciplinary action for the reduction in productivity. In 1998, the company performed a second ergonomics study for Plaintiff. Plaintiff received a specially ordered chair and a vise assembly that allowed Plaintiff to work comfortably at his station.

> Plaintiff alleges that he is disabled and that the company refused [to] reasonably ... accommodate the Plaintiff's needs to take prescription medication necessary to control his neck pain. Plaintiff was taking Darvocet and Lortab. The company's policy was not to allow employees to work around machinery when they were taking such medications. If Plaintiff needed to take the medications, the company would send him home and pay him for the rest of the day. Plaintiff cannot identify any

**2.** Defendant LMUS owned the plant until May 1999, when United States Enrichment Corporation assumed operations and became the employer for all LMUS employees.

white employees who were allowed to work while taking similar medication.

Plaintiff claims that he suffers from sleep apnea. The company has no record of a doctor's diagnosis of sleep apnea. Plaintiff has received two machines to help him with his nighttime breathing. There is no record of Plaintiff asking for any specific accommodation for sleep apnea.

Plaintiff complains of other instances of alleged discrimination. In May 1995 and May 1996, Plaintiff requested permission to take a computer course at company expense. The course, entitled "Learn to Use the PC with Multimedia" cost $2,489.00 and included a computer which the participant could keep. Plaintiff was not certain what the course was about, but he believed it would help him with future promotions. Dale Miles, a supervisor, and Cothorn denied the request without giving Plaintiff a reason. Plaintiff claims that white workers were able to take computer courses. In 1998, Plaintiff applied for another computer course which cost $680.00. The company approved the course, but Plaintiff did not attend, [and explained at deposition that] he was just testing the company.

Plaintiff claims that he was disciplined in 1996 for making a complaint about safety issues. Before the beginning of work, the supervisors of the instrument department held a meeting in the lunchroom for all employees to review safety issues and work assignments for the day. Plaintiff frequently missed these meetings. He often stood in the hall, outside the view of the supervisors. Sometimes he did not change into his work attire, as required. Plaintiff believed that the lunchroom was too small to hold the meeting. He complained to his supervisors about the occupancy level of the lunchroom. The supervisors believed that Plaintiff was using the concerns about occupancy as an excuse for not attending the meeting on time. Plaintiff received a "coaching and counseling" written reprimand for his failure to attend the safety meetings. The reprimand is a form of discipline, but it does not involve any job detriment. Plaintiff states that white and non-disabled employees also stood outside of the room because of safety concerns. Plaintiff filed a complaint with OSHA alleging that he was being discriminated against for making a safety complaint. OSHA dismissed the complaint and Plaintiff dropped the appeal.

On January [6], 1997, Plaintiff [signed] a charge with the EEOC. He alleged discrimination based on race and disability because the company denied him education assistance and refused to raise his workbench to accommodate him. On January 10, 1997, Plaintiff's supervisors, Cothorn and Jones, gave Plaintiff a written reminder discipline for his bad attitude and insubordination. On January 13, Cothorn and Jones found Plaintiff asleep at his work station. Sleeping on the job at any time was prohibited. Pursuant to the company's no tolerance policy, Plaintiff was discharged. Plaintiff was reinstated later by an arbitrator. Plaintiff claimed that he was not sleeping, but reading the Bible and meditating. However, the arbitrator found the supervisors' testimony regarding Plaintiff's sleeping credible. He felt the company's zero tolerance policy was unfair. Plaintiff claims that the company found similarly-situated white and non-disabled employees sleeping on the job but did not terminate them.

After his reinstatement in December 1997, Plaintiff claims that he was mistreated. Security escorted him at the plant because he had lost his security

clearance after his discharge. It took six months to reinstate his security clearance. The instrumentation department was a secured area that required escorts of persons without security clearance. Plaintiff claims that he should have been allowed to work in an unsecured area until his security clearance was reinstated. Plaintiff also objects to a search of his tote bag by five security guards [on one occasion]. He also alleges that the company falsely accused him of compromising the security of the plant because Plaintiff was seeing a psychologist. Plaintiff does not know who made the accusation or what they said. Plaintiff also resented the security camera that the company placed in his department. His department had been experiencing thefts from the storage cabinet. Plaintiff believed that the camera was installed to spy on him, although he has no evidence of this. Plaintiff would stack boxes to hide himself from the camera while working.

Plaintiff also had an incident with Cothorn. Cothorn accused plaintiff of giving him a dirty look and told him that if Plaintiff gave him that look at a barroom, Plaintiff "would have a major problem." (Cartwright depo. p. 75). Plaintiff claims this statement was a threat of bodily harm.

Plaintiff also complains that the company required him to bring doctor's excuses for his absences and to call in timely to the plant when he was unable to come to work. Plaintiff felt that his illnesses were well documented and that he did not need to bring doctor's excuses.

In January 1999, Plaintiff filed for short-term disability due to depression, high blood pressure and severe anguish. Plaintiff's hypertension had been a problem since 1978 or 1979. Plaintiff's doctor stated that plaintiff's depression was caused by his problems with Jones and Cothorn. The doctor suggested that he be moved to another area of the plant. The company plant manager, Howard Pulley, offered to move him to another group. Plaintiff refused the offer because he felt that he did not have sufficient training for the other area in the instrumentation department. Plaintiff received six months of short-term disability benefits. He voluntarily applied for long-term disability and has now received it.

The agency complaint of discrimination was referred to the Kentucky Commission on Human Rights, which dismissed the complaint in November 1998. The EEOC adopted the state agency's findings and issued a right-to-sue letter on January 28, 1999. Plaintiff filed this action on April 20, 1999.

On August 21, 2000, the district court entered its order granting summary judgment to defendant on each of plaintiff's claims. Plaintiff filed a timely motion to alter or amend judgment, which was denied on November 16, 2000. This appeal followed.

## II.

The district court's decision to grant summary judgment is reviewed *de novo*. *Smith v. Ameritech*, 129 F.3d 857, 863 (6th Cir.1997). In deciding a motion for summary judgment, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The nonmoving party may not rest on its pleadings, but must come forward with evidence from which a rational trier of fact could find in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106

S.Ct. 2505, 91 L.Ed.2d 202 (1986). Plaintiff claims that his termination in January 1997 was because of disability, race, or in retaliation for filing a complaint of discrimination with the EEOC. He further contends that he was constructively discharged because of disability and/or race when he began receiving short-term disability benefits in January 1999.

## A. ADA

■ Title I of the ADA prohibits a covered employer from discriminating "against a qualified individual with a disability" because of his disability. 42 U.S.C. § 12112(a). A "qualified individual with a disability" is a person with a disability who can perform the essential functions of the job with or without reasonable accommodation. *See* 42 U.S.C. § 12111(8). A "disability" is defined as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment; or (C) being regarded has having such an impairment." 42 U.S.C. § 12102(2).

Although plaintiff argues on appeal that he was disabled under (C) because he was regarded as having an impairment that substantially limited one or more major life activities, he did not assert this theory in the proceedings before the district court. As a result, this alternative claim has been waived and we will not decide the issue on appeal. *See White v. Anchor Motor Freight, Inc.*, 899 F.2d 555, 559 (6th Cir.1990); *Chandler v. Jones*, 813 F.2d 773, 777 (6th Cir.1987).[3]

Rather, plaintiff maintained that the physical and mental impairments of sleep apnea, hypertension, depression, and pain substantially limited him in the major life activities of "sleeping" and "working." "Substantially limited" is defined by the EEOC's regulations to mean either "[u]nable to perform a major life activity that the average person in the general population can perform"; or "[s]ignificantly restricted as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1)(ii). In determining whether an individual is substantially limited in a major life activity, we are directed to consider the "nature and severity of the impairment," its "duration or expected duration," and the "permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2).[4]

---

**3.** To establish disability under the "regarded as" prong of the statute, plaintiff must show that his employer entertained misperceptions either that the individual has a substantially limiting impairment that he does not have, or that he has a substantially limiting impairment when in fact it is not so limiting. *See Ross v. Campbell Soup Co.*, 237 F.3d 701, 706 (6th Cir.2001) (quoting *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999)). In support of this theory, plaintiff argues on appeal only that defendant was aware of his diagnosis of sleep apnea, his neck injury and surgery, and medications he was taking for pain. He relies on a note found in one of his employment files that attempts to define an impairment that substantially limits an individual's ability to sleep. It is not addressed, or dated, and is a general discussion that distinguishes between slightly restricted and significantly restricted ability to sleep. This note was submitted with plaintiff's motion to alter or amend judgment. Plaintiff cannot show he was regarded as substantially limited in the activity of "working" as defendant offered him a transfer to another area when he could no longer work for Jones and Cothorn.

**4.** We note that the Supreme Court has taken care to point out that it has not decided what deference, if any, is due to the EEOC's regula-

## 1. Sleeping

A major life activity is one that is of central importance to daily life. *Toyota Motor Mfg., Ky., Inc. v. Williams,* 534 U.S. 184, 122 S.Ct. 681, 691, 151 L.Ed.2d 615 (2002). Several circuits have concluded that "sleeping" is a major life activity. *See, e.g., EEOC v. Sara Lee Corp.,* 237 F.3d 349, 352 (4th Cir.2001); *Pack v. Kmart Corp.,* 166 F.3d 1300, 1305 (10th Cir.1999); *Colwell v. Suffolk County Police Dept.,* 158 F.3d 635, 643 (2d Cir.1998). *See also Boerst v. Gen. Mills Operations, Inc.,* 25 Fed.Appx. 403, 406 (6th Cir.2002) (unpublished disposition), *petition for cert. filed,* —— U.S. ——, 122 S.Ct. 2294, 152 L.Ed.2d 1052, 70 U.S.L.W. 3643 (2002). Without addressing this issue, the district court found that plaintiff had not offered evidence to show either that he was diagnosed with sleep apnea or that his sleep apnea limited his major life activities in any way.

Challenging this finding, plaintiff points to his own deposition testimony and the arbitrator's decision reinstating his employment as sufficient evidence to meet his burden in this regard. Specifically, plaintiff testified that he was diagnosed as having sleep apnea and that he was prescribed an expensive breathing machine to use at night, which was paid for by his company health insurance one or two months before he was discharged for sleeping on the job. The arbitrator's written decision mentions "the many exhibits [the union] introduced to show that [plaintiff] has medical problems, including sleep apnea, for which medications with side effects of inducing sleep have been prescribed." None of those exhibits, however, appear to have been submitted to the district court in opposition to summary judgment.

Moreover, "[i]t is insufficient for individuals attempting to prove disability status under this test to merely submit evidence of a medical diagnosis of an impairment." *Williams,* 122 S.Ct. at 691. An individualized case-by-case assessment of the effect of that impairment on the plaintiff's life is required, including the extent of its limitation on a major life activity and the effect of any corrective or mitigating measures taken by the plaintiff. *Id.* at 691–92 (citing *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 483–84, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999)); *see also Albertson's, Inc. v. Kirkingburg,* 527 U.S. 555, 566, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999) (disability not based on the diagnosis, but on the effect of that impairment on the life of the individual).

We agree with the district court that plaintiff has failed to create a genuine issue of material fact regarding whether his impairment of sleep apnea substantially limits any major life activity. The only evidence offered in this regard was plaintiff's testimony that because sleep apnea deprives the body of oxygen, he would wake up more tired than when he went to sleep. Plaintiff said he still had sleep apnea, but used the machine prescribed for him to help him keep breathing while he sleeps. Using the machine helped plaintiff get a better night sleep and alleviated his problem "somewhat." The record is devoid of evidence concerning the severity of plaintiff's impairment, which can be expected to vary from person to person, and the extent to which the condition disrupted his sleep either before or after he began using the breathing machine. *See Pack,* 166 F.3d at 1306; *Colwell,* 158 F.3d at 644; *Boerst,* 25 Fed.Appx. at 407 ("Getting between two and four hours of sleep a night, while inconvenient, simply lacks the kind

tions interpreting the ADA. *See Toyota Motor Mfg., Ky., Inc. v. Williams,* 534 U.S. 184, 122 S.Ct. 681, 689, 151 L.Ed.2d 615 (2002); *Sutton,* 527 U.S. at 479–80.

**154**

of severity we require of an ailment before we will say that the ailment qualifies as a substantial limitation under the ADA.").

### 2. Working

■ The Supreme Court has assumed without deciding that "working" is a major life activity for purposes of the ADA and that the EEOC's regulations in this regard are reasonable. *See Williams,* 122 S.Ct. at 692–93; *Sutton,* 527 U.S. at 492. At a minimum, the phrase "substantially limits" requires that "plaintiffs allege they are unable to work in a broad class of jobs." *Sutton,* 527 U.S. at 491.

> To be substantially limited in the major life activity of working, then, one must be precluded from more than one type of job, a specialized job, or a particular job of choice. If jobs utilizing an individual's skills (but perhaps not his or her unique talents) are available, one is not precluded from a substantial class of jobs. Similarly, if a host of different types of jobs are available, one is not precluded from a broad range of jobs.

*Id.* at 492. The district court noted that the fact that plaintiff has been diagnosed with certain disorders, such as hypertension, depression, sleep apnea, and neck pain, does not prove he was disabled under the ADA. The district court explained as follows:

> Plaintiff's depression allegedly is caused by his relationship with Jones and Cothorn and affects his ability to work with those supervisors. However, Plaintiff has not demonstrated that he is unable to perform a class of jobs or a broad range of jobs in various classes. Even assuming that his job related stress is a mental or physical impairment as defined under the ADA, all Plaintiff can demonstrate is that he cannot work under Jones and Cothorn. Plaintiff is not a disabled person under the ADA.

On appeal, plaintiff first shifts focus to his neck injury that lead to surgery in 1995. Plaintiff testified that his condition caused him to take pain medication for a period of time, but defendant would not let him work while on the medication. He also conceded that he was sent home with pay on those occasions. Further, although plaintiff was not satisfied with defendant's first attempt to accommodate his neck problems, plaintiff was satisfied with the accommodations made after he was reinstated by the arbitrator.

At the time plaintiff took disability leave, it was the stress of working with his supervisors that allegedly caused plaintiff's impairments, including his neck problems, to interfere with his ability to continue doing his job. Plaintiff concedes that the stress would have been alleviated by a change of supervisors, but argues that this fact does not defeat his claim. This claim fails because plaintiff offered no evidence that he could not perform either a class of jobs or a broad range of jobs in various classes. Therefore, he cannot demonstrate he was significantly limited in the life activity of working. *See Penny v. UPS,* 128 F.3d 408, 415 (6th Cir.1997) (allegation of substantial limitation not enough to avoid summary judgment when testimony does not support claim that impairment rises to level of a disability).

### B. Retaliation

■ Plaintiff argues that his discharge for sleeping on the job was in retaliation for having filed an EEOC charge of discrimination based on race and disability. To establish a *prima facie* case of retaliation, plaintiff must show that (1) he engaged in protected activity; (2) he was subjected to an adverse employment action; and (3) there is a causal link between the protected activity and the adverse employment action. *Canitia v. Yellow*

*Freight Sys., Inc.*, 903 F.2d 1064, 1066 (6th Cir.1990); *see also EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 860 (6th Cir.1997). The district court granted summary judgment to defendant on this claim, finding there was no evidence that the company even knew he had filed the complaint until after his termination.

Plaintiff points out that he contacted the EEOC in November 1996, which was confirmed by a letter the EEOC sent to plaintiff on December 30, 1996. However, it is clear from the letter that it was sent by the EEOC to plaintiff in order to have plaintiff sign and return the charge that had been drafted as a result of his earlier visit. The charge was signed on January 6, 1997, and presumably returned to the EEOC to be processed. There is no evidence that plaintiff's supervisors were made aware of the charge. In fact, the record indicates that the charge was sent to defendant by the EEOC under a cover letter that was dated January 29, 1997, and stamped received by the company on February 3, 1997.

To create a question of fact on the issue, plaintiff relies on his own self-serving and nonspecific testimony that someone at the EEOC notified him that they had notified the company of the charges a few days before he was terminated for sleeping on the job. Not only is this assertion inconsistent with the documentary evidence, it is inadmissible hearsay that may not be considered on a motion for summary judgment. *See Wiley v. United States*, 20 F.3d 222, 226 (6th Cir.1994). Absent evidence that defendant was aware of the EEOC charge when plaintiff was disciplined for sleeping on January 13, 1997, plaintiff cannot establish a causal connection between the charge and the adverse employment action.

## C. Race Discrimination

Plaintiff relied on the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to establish race discrimination in his discharge for sleeping in 1997 and for the alleged constructive discharge in 1999. To make a *prima facie* case, plaintiff must show that (1) he was a member of a protected class; (2) he was subjected to an adverse employment action; (3) he was qualified; and (4) he was treated differently than similarly situated white employees for the same or similar conduct. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582–83 (6th Cir.1992). Once a *prima facie* showing is made, the burden of production shifts to the employer to articulate a legitimate nondiscriminatory reason for its action. The ultimate burden of persuasion rests with plaintiff to prove that the proffered reasons were pretext for discrimination. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142–43, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir.1994).

The district court found that plaintiff had made a *prima facie* showing with respect to his discharge for sleeping because there was evidence that defendant did not discharge white employees for sleeping on the job. However, defendant's zero-tolerance policy of no sleeping on the job, even during breaks, constituted a legitimate nondiscriminatory reason for plaintiff's discharge. There was evidence that defendant would not fire an employee who was caught sleeping unless there were two witnesses who could say they saw the employee actually sleeping. Plaintiff was discharged after two supervisors witnessed plaintiff sleeping during a break. Scott Kossack, a white employee, was not discharged for sleeping because only one su-

pervisor could testify to having seen him sleeping on the job.[5]

Plaintiff then bore the burden of demonstrating that a genuine issue of material fact existed on the question of whether defendant's reason was pretext for race discrimination. Pretext may be established by showing that the proffered reason had no basis in fact, did not actually motivate the actions, or was insufficient to motivate the actions. *See Kocsis v. Multi–Care Mgmt. Inc.*, 97 F.3d 876, 883 (6th Cir.1996). Plaintiff argues that the district court erred by making a credibility determination regarding whether plaintiff was caught sleeping. On the contrary, the district court observed that the *arbitrator* found the supervisors to be credible but reinstated plaintiff because the policy was too harsh. There was evidence that white employees, including a white supervisor, were fired for sleeping on the job. At the same time, there was no evidence that the company's witness requirement—that there be more than one witness to a sleeping incident before an employee may be discharged—was pretext for discrimination.

Finally, the district court found that, other than his discharge for sleeping, plaintiff was not subjected to a materially adverse employment action. *See Bowman v. Shawnee State Univ.*, 220 F.3d 456, 461 (6th Cir.2000). To establish an adverse action, plaintiff argues that a pattern of discriminatory treatment caused him to be constructively discharged when he decided to apply for short-term and then long-term disability benefits. To demonstrate constructive discharge, plaintiff would have to show that his working conditions were so difficult or unpleasant that " 'a reasonable person in the employee's shoes would have felt compelled to resign." ' *Keever v. City of Middletown*, 145 F.3d 809, 813 (6th Cir. 1998) (quoting *Easter v. Jeep Corp.*, 750 F.2d 520, 522–23 (6th Cir.1984)).

In particular, plaintiff references his discharge for sleeping on the job, the failure (at least initially) of defendant to adequately accommodate his neck problems, the denial of his first two requests for computer training, the written reprimand for not attending meetings in the lunchroom, being escorted to and from his work station pending reinstatement of his security clearance, video surveillance of his work area, and "verbal harassment" by a supervisor when he did not like the "look" plaintiff gave him. At the time plaintiff requested disability leave, however, plaintiff was offered a position in another department working for other supervisors. Conceding that the stress which precipitated the request for disability leave would have been alleviated if he had a change in supervisors, plaintiff refused the transfer to a position working for other supervisors because he did not feel he had the training it required. Plaintiff was not constructively discharged, but chose to take advantage of the disability leave benefits provided by his employer. After six months, plaintiff made no attempt to return to work and began receiving long-term disability benefits.

■ Lastly, in his motion to alter or amend judgment, plaintiff relied on a memorandum placed into his personnel file

---

5. On appeal, plaintiff also relies on evidence that the employees in the electrical department were commonly permitted to sleep on their lunch breaks. The electrical department, with only two African–American employees, was located next to the instrument shop where plaintiff worked. Given that the electrical department employees reported to different supervisors who chose not to enforce the zero-tolerance no-sleeping policy, these employees are not similarly situated to plaintiff in all relevant respects. *Mitchell*, 964 F.2d at 583.

on July 12, 1999, which stated that he was not eligible for rehire due to his "long standing poor work performance, unwillingness to cooperate with management and his demeaning and sometimes hostile attitude towards management and his peers preclude him from being rehired. Workplace morale and productivity have increased with the absence of Mr. Cartwright from PGDP." Defendant responded that the memorandum was erroneously prepared and that plaintiff remained eligible to seek re-employment for 24 months under the express terms of the long-term disability plan. Plaintiff argues on appeal that this memorandum is itself an adverse employment action, and lends support to his claim of constructive discharge. On the contrary, no *action* was taken because plaintiff was on disability leave and there is no evidence that he ever sought but was denied re-employment. Further, as the district court found, while these statements indicate that his supervisors had problems with his performance and attitude, there is no evidence that it was pretext for discrimination. The district court concluded that plaintiff "has simply failed to show that 'the strength of his circumstantial evidence' of racial discrimination 'overwhelms, or at least would permit a reasonable juror to conclude that it overwhelms' the litany of non-discriminatory reasons given by LMUS to justify its decisions, including those found in the personnel file memorandum."

**AFFIRMED.**