Brenda LANGLEY, Plaintiff,

v.

**DAIMLERCHRYSLER CORP., Defendant.**

No. 3:04 CV 7676.

United States District Court,
N.D. Ohio,
Western Division.

Dec. 28, 2005.

Michael D. Portnoy, Rossford, OH, for Plaintiff.

Heidi N. Eischen, Robert J. Gilmer, Jr., Thomas J. Gibney, Eastman & Smith, D. Casey Talbott, James R. Knepp, II, Robi-

son, Curphey & O'Connell, Toledo, OH, for Defendant.

## MEMORANDUM OPINION

KATZ, District Judge.

This matter is before the Court on five separate motions: Defendant Daimler-Chrysler's Motion for Summary Judgment (Doc. No. 70) and Supplemental Motion for Summary Judgment (Doc. No. 101); Defendant Debra Lobzun's Motion for Summary Judgment (Doc. No. 71); Plaintiff Brenda Langley's Motion for Partial Summary Judgment (Doc. No. 87); and DaimlerChrysler's Motion to Strike Plaintiff's Motion for Summary Judgment, Supporting Memorandum, and Attachments (Doc. No. 103). All five motions have been fully briefed and are now decisional. The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1367. For the reasons that follow, all of Defendants' motions for summary judgment are granted; Plaintiff's motion for summary judgment is denied; and DaimlerChrysler's motion to strike is denied as moot.

### BACKGROUND

DaimlerChrysler hired Plaintiff in 1984 as a production worker in an hourly bargaining unit at the Toledo Jeep Assembly Plant. Plaintiff was transferred to DaimlerChrysler's Trenton Engine plant in Michigan in 1992. In 2000, she accepted a salaried clerical position at Trenton. The next year, she earned a bachelor's degree. In 2003, she applied for and was hired into a non-union management position as a production supervisor at DaimlerChrysler's Toledo North Assembly Plant ("TNAP"). In that position, Plaintiff initially had difficulty with other supervisors' management style, and soon began to "panic," fearing she would be trapped in the production supervisor position until she retired. In late 2003 and early 2004, Plaintiff asked to be returned to her previous position, but DaimlerChrysler denied the request. Plaintiff's job satisfaction improved when she began to work under a different supervisor in January of 2004.

Plaintiff had difficulty with some of her coworkers, notably Defendant Debra Lobzun, one of the hourly production workers Plaintiff supervised. In February of 2004, Plaintiff gave Lobzun a verbal warning for visiting friends in another department when she was ostensibly going to the bathroom, and for ignoring a direct instruction from Plaintiff. Plaintiff testified that when she would speak to Lobzun, the latter would turn her head and ignore Plaintiff. At the time, Plaintiff found the incident "rather insignificant," and just "chalked it up" to the fact that Plaintiff was "management," and Lobzun was "hourly." (Doc. No. 80, pp. 124, 138).

On February 19, 2004, Plaintiff argued with a union steward named Robert Rodriguez over whether production workers should point out product defects. Plaintiff described part of the exchange as follows: "He said 'Fuck you.' And I said, 'Well, fuck you.' You know, I mean, this kind of factory talk." (Doc. No. 80, p. 146). Rodriguez then screamed "You stupid fucking bitch" at her, twice. *Id.* at 147. Plaintiff reported the exchange to DaimlerChrysler's Labor Relations, which asked Rodriguez to apologize. He refused, and denied that he had screamed obscenities at Plaintiff. Labor Relations investigated, but no witnesses heard Rodriguez call Plaintiff a "stupid fucking bitch," so Labor Relations warned both Plaintiff and Rodriguez that they had acted unprofessionally by arguing in front of employees.

On March 3, 2004, Plaintiff issued Lobzun a written warning for insubordination. Lobzun's job on the assembly line was not being completed, and when Plaintiff asked Lobzun why, Lobzun turned

away and did not respond. Plaintiff asked Lobzun, "Do you know the meaning of insubordination? Because you're about to get real familiar with it." (Doc. No. 80, p. 169). Lobzun threw down her equipment and walked off the assembly line. Two days later, a Labor Relations Representative told Plaintiff that Lobzun had complained that Plaintiff was harassing her, but that the actions complained of would not amount to a finding of harassment.

When Plaintiff mentioned this incident to another supervisor, he told Plaintiff he had overheard Lobzun say to two other employees, "The bitch was goin' down and I'm gonna make it happen." (Doc. No. 80, p. 189–90). The supervisor reported the comment to Labor Relations, and the latter investigated. Neither employee to whom Lobzun allegedly made the comment confirmed the supervisor's allegation, so Labor Relations took no action against Lobzun.

On April 8, 2004, a team leader and union member named Linda Lester accused Plaintiff of pushing her. Lester had stopped the assembly line, and Plaintiff had told her to restart it three times, with no response. Plaintiff walked quickly to the line, saying "Jesus frickin' Christ," and re-started the line herself. (Doc. No. 82, p. 575). Lester complained to Labor Relations that Plaintiff's shoulder came into contact with hers when Plaintiff restarted the assembly line. Labor Relations investigated. Plaintiff denied any physical contact; three witnesses, including Defendant Lobzun, made statements to the contrary. Labor Relations concluded that if any contact occurred, it was neither intentional nor harmful. It disciplined Lester for disobeying Plaintiff's order.

On April 29, 2004, Plaintiff was summoned to meet with the members of the Local Response Team ("LRT"), which investigates troubling employees and situa-

tions. The LRT told Plaintiff that Lobzun had called a corporate office and reported that "people were threatening to pull a Daryl Richardson on [Plaintiff]." (Doc. No. 81, p. 256). Daryl Richardson was a supervisor who was beaten with a baseball bat in the parking lot of TNAP in an incident well-known to DaimlerChrysler employees, including Plaintiff. Lobzun had called Scott Huller of the corporate Diversity Office in Auburn Hills, Michigan, to complain about the work environment created by Plaintiff. Huller told Lobzun at the outset of their conversation that it would be confidential. Huller reported Lobzun's comments to a Labor Relations Representative, who interviewed Lobzun, who repeated her complaints about the working environment Plaintiff had created and suggested that Plaintiff be transferred. Lobzun also repeated her comments about Daryl Richardson. The LRT was convened to investigate.

The investigation revealed that no employee had actually threatened Lobzun directly. DaimlerChrysler counseled Lobzun about exaggerating her report of threats. It reported its findings to Plaintiff so she would not hear false rumors. Plaintiff testified that she thought DaimlerChrysler did the right thing by relaying the information to her, but only wished they had done so sooner. Plaintiff testified that the LRT told her that Lobzun had made up the threats against Plaintiff to get Plaintiff transferred out of the area. Plaintiff further testified that she believed the LRT's conclusion. However, Plaintiff concluded that Lobzun had threatened her.

After the meeting with the LRT, Plaintiff was unable to return to her job. She went to her family doctor, who advised her to take some time off work due to the stress she was experiencing. Plaintiff has not returned to work since. DaimlerChrysler maintains that it has not termi-

nated her, and that she has not quit. Plaintiff testified she is on "stress leave."

Plaintiff sought short-term disability benefits through DaimlerChrysler's Disability Absence Plan ("DAP"), which provides salary payments to employees who are unable to perform all the duties of their occupation. DaimlerChrysler denied Plaintiff's claim initially, and again on appeal. Plaintiff saw her family doctor monthly from April, 2004, to February, 2005. She intermittently saw a social worker. She had one appointment with a psychologist named Dr. Muehleisen, while waiting for an appointment with a psychiatrist, Dr. Sherman. She saw Dr. Sherman once. He referred her to a psychologist named Dr. Forgac, whom she saw repeatedly.

From May to November of 2004, Plaintiff took several vacations, attended an Eric Clapton concert, and planned two birthday parties. In June, 2004, she incorporated a business called "Lucky Puppy Doggy Daycare," which she opened in August, 2005. Since April 29, 2005, Plaintiff has attempted to find a union position through DaimlerChrysler's internal placement process, has sent out resumes in response to newspaper and internet advertisements, and has applied to temporary agencies.

Plaintiff brought suit against DaimlerChrysler and Lobzun on September 22, 2004, in Lucas County, Ohio, Common Pleas Court. DaimlerChrysler removed to this Court. Plaintiff's Second Amended Complaint sets forth claims against DaimlerChrysler for: wrongful discharge in violation of Ohio public policy (Count One); age discrimination in violation of Ohio Revised Code § 4112.02 and Ohio public policy (Counts Two and Three); sex discrimination in violation of Ohio Revised Code § 4112.02 and Ohio public policy (Counts Four and Five); intentional infliction of emotional distress (Count Six); violation of the Employee Retirement Income Security Act ("ERISA") (Count Eight); breach of contract (Count Nine); and disability discrimination in violation of Ohio Revised Code § 4112.02 (Count Ten). Plaintiff also states a claim against Lobzun for intentional infliction of emotional distress (Count Seven).

### DISCUSSION

Defendants have moved for summary judgment on all of Plaintiff's claims, with DaimlerChrysler addressing Count Nine of Plaintiff's amended complaint in a supplemental motion. Plaintiff has moved for summary judgment on her ERISA claim only. DaimlerChrysler has additionally moved to strike Plaintiff's motion for summary judgment and its attachments.

### A. Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). The moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim. *Id.* at 323–25, 106 S.Ct. 2548. Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genu-

ine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986) (*quoting* FED.R.CIV.P. 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *see also Harris v. General Motors Corp.,* 201 F.3d 800, 802 (6th Cir.2000). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552.

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the non-moving party." *Williams v. Belknap,* 154 F.Supp.2d 1069, 1071 (E.D.Mich.2001) (citing *60 Ivy Street Corp. v. Alexander,* 822 F.2d 1432, 1435 (6th Cir.1987)). However, " 'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter,' " *Wiley v. U.S.,* 20 F.3d 222, 227 (6th Cir.1994) (quoting *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505); therefore, "[t]he Court is not required or permitted . . . to judge the evidence or make findings of fact." *Williams,* 154 F.Supp.2d at 1071. The purpose of summary judgment "is not to resolve factual issues, but to determine

if there are genuine issues of fact to be tried." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.,* 130 F.Supp.2d 928, 930 (S.D.Ohio 1999). Ultimately, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505; *see also Atchley v. RK Co.,* 224 F.3d 537, 539 (6th Cir.2000).

**B. Age and Sex Discrimination Claims**

■ Plaintiff has presented no evidence or argument in response to DaimlerChrysler's motion for summary judgment on Plaintiff's age and sex discrimination claims, Counts Two through Five. However, in her response to DaimlerChrysler's motions, Plaintiff stated that she "has acknowledged and hereby notifies this Court that she is dismissing, with the Court's permission, her age discrimination claims against DaimlerChrysler," i.e., Counts Two and Three (Doc. No. 109, p. 31). She subsequently filed a "Notice of Dismissal" of her sex discrimination claims, Counts Four and Five. (Doc. No. 112). The Court will construe these as motions for leave to dismiss under Federal Rule of Civil Procedure 41(a)(2), and will deny those motions.

The Sixth Circuit has explained:

Whether dismissal should be granted under the authority of Rule 41(a)(2) is within the sound discretion of the district court. . . . Generally, an abuse of discretion is found only where the defendant would suffer "plain legal prejudice" as a result of a dismissal without prejudice, as opposed to facing the mere prospect of a second lawsuit.

In determining whether a defendant will suffer plain legal prejudice, a court should consider such factors as the defendant's effort and expense of prepara-

tion for trial, excessive delay and lack of diligence on the part of the plaintiff in prosecuting the action, insufficient explanation for the need to take a dismissal, and whether a motion for summary judgment has been filed by the defendant.

*Grover ex rel. Grover v. Eli Lilly & Co.*, 33 F.3d 716, 718 (6th Cir.1994).

Here, DaimlerChrysler has conducted discovery and filed a motion for summary judgment regarding Plaintiff's age and sex claims. Plaintiff has provided no explanation for her request to dismiss those claims. Therefore, the motions for leave to dismiss are denied. Furthermore, Plaintiff having identified no supporting evidence in response to DaimlerChrysler's motion for summary judgment on the age and sex discrimination claims, that motion is granted.

## C. Intentional Infliction of Emotional Distress

 Plaintiff brings intentional infliction of emotional distress claims against both Lobzun and DaimlerChrysler. To establish a claim of intentional infliction of emotional distress, Plaintiff must show that:

> (1) defendant intended to cause emotional distress, or knew or should have known that actions taken would result in serious emotional distress; (2) defendant's conduct was extreme and outrageous; (3) defendant's actions proximately caused plaintiff's psychic injury; and (4) the mental anguish plaintiff suffered was serious.

*Hanly v. Riverside Methodist Hosp.*, 78 Ohio App.3d 73, 603 N.E.2d 1126, 1132 (1991). For conduct to be found "extreme and outrageous":

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has

intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

> The liability clearly does not extend to mere insults, indignities, *threats*, annoyances, petty oppressions, or other trivialities.

Restatement (Second) of Torts § 46 cmt. d (1965), *quoted with approval in Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen & Helpers*, 6 Ohio St.3d 369, 453 N.E.2d 666, 671 (1983) (emphasis added). "An element of proximate cause is that the harm which results must be such that the actor might anticipate it as likely to happen." *Erie County United Bank v. Berk*, 73 Ohio App. 314, 56 N.E.2d 285, 287 (1943). Finally, "[s]erious emotional distress describes emotional injury which is both severe and debilitating. Thus, serious emotional distress may be found where a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case." *Paugh v. Hanks*, 6 Ohio St.3d 72, 451 N.E.2d 759, 765 (1983).

### 1. Plaintiff's Claim Against Lobzun

 Lobzun has moved for summary on Plaintiff's intentional infliction of emotional claim against her, correctly claiming the evidence presents no genuine issue of fact

as to several of the required elements. Plaintiff bases her claim against Lobzun on the threats Lobzun reported to DaimlerChrysler management and that Plaintiff found out about in her April 29, 2004, meeting with the LRT. Plaintiff is unable to show Lobzun acted with intent to cause her emotional harm, that Lobzun's actions were "extreme and outrageous," or that Lobzun's actions proximately caused Plaintiff's injuries.

The evidence is uncontroverted that Lobzun was told her communications with management would be kept confidential, and that when she told management that people were making "Daryl Richardson" comments in connection with Plaintiff, Lobzun believed management would keep her statements confidential. Plaintiff admitted that she believes Lobzun's assertion that when Lobzun spoke, she did so in confidence. There is no evidence indicating that Lobzun knew or should have known that her statements would ever be communicated to Plaintiff. Therefore, there is no evidence showing Lobzun intended to cause Plaintiff emotional distress, or should have expected her actions would do so.

In any event, as explained in *Yeager*, Lobzun's conduct does not rise to the level of "extreme and outrageous." The record indicates that, despite Plaintiff's mistaken understanding to the contrary, Lobzun did not actually threaten Plaintiff, but merely reported that others had done so, which turned out not to be true. Lobzun's motivation was, apparently, to get Plaintiff transferred to another department. Nothing in the record amounts to evidence, as opposed to Plaintiff's unsupported speculation, that Lobzun actually threatened to harm Plaintiff. Indeed, it makes little sense that Lobzun would threaten Plaintiff's life in confidence to DaimlerChrysler management. However, even if Lobzun

had actually made the threats, *Yeager* expressly provides that doing so is not "extreme and outrageous" conduct. Certainly, therefore, neither is reporting threats, falsely or otherwise.

Moreover, as Lobzun spoke to DaimlerChrysler management in confidence, under the reasonable expectation that her statements would not be conveyed to Plaintiff, the Court finds Lobzun's actions were not the proximate cause of any injury to the Plaintiff. As noted in *Berk*, proximate cause incorporates considerations of foreseeability, and there is no evidence that Lobzun should have realized it was likely that DaimlerChrysler would convey her confidential concerns to Plaintiff, and that Plaintiff would thereby be injured psychologically. Finding Plaintiff's evidence insufficient to create an issue of fact as to the first three elements of her claim, it is unnecessary to consider the fourth element.

### 2. Plaintiff's Claim Against DaimlerChrysler

In her answers to interrogatories and her deposition testimony, Plaintiff originally cited three bases for her intentional infliction of emotional distress claim against DaimlerChrysler: the incident in which a union steward screamed at her, after they had traded obscenities; the denial of her claim for disability benefits; and "the decision not to give [her] a safe working environment." In her Response to DaimlerChrysler's summary judgment motion, Plaintiff additionally asserts that Dr. Forgac's affidavit establishes the elements of her claim. Plaintiff apparently does not base her claim on DaimlerChrysler's April 29, 2004, divulging to her of Lobzun's confidential report of threats against Plaintiff.

■ On February 19, 2004, over two months before Plaintiff left work, a union

steward screamed "you stupid fucking bitch" at her, after an argument during which each had encouraged the other to "fuck you." While vulgar, this insult does not rise to the level of "extreme and outrageous" under *Yeager.* Moreover, there is no evidence that any action of Daimler-Chrysler related to this incident caused Plaintiff emotional distress. The union steward was not representing Daimler-Chrysler when he spoke. Company management conducted an investigation into the matter, but was unable to substantiate Plaintiff's claim that the steward insulted her, and ultimately advised Plaintiff that both she and the steward had behaved unprofessionally by arguing and swearing in front of other employees. Finally, as Plaintiff continued to work for over two months after the incident, there is no evidence linking it to any debilitating emotional distress.

■ There is no evidence showing Plaintiff's claim for disability benefits was denied with the intent to cause Plaintiff emotional harm, or knowledge that it would. In fact, Plaintiff admitted that the person who denied the claim "probably thought he had a good reason." Moreover, this Court is unprepared to accept the proposition that the denial of a benefits claim—even an improper denial—is "utterly intolerable in a civilized community."

■ Plaintiff claims DaimlerChrysler was required to "comply with its own safety procedures" after management learned of the threats Lobzun reported and about a supervisor's report that Lobzun had stated on March 9, 2004, "the bitch is going down and I'm going to make sure it happens." Plaintiff fails to specify what those safety procedures would have required, or how DaimlerChrysler failed to follow them. The record reflects that management convened the LRT, investigated the claims, found them unsubstantiated, and deter-

mined Plaintiff was not in danger. The company's reliance on its conclusion after conducting an investigation is not "extreme and outrageous." Moreover, there is no evidence that DaimlerChrysler acted or failed to act with the intent to cause Plaintiff emotional harm.

Finally, while Dr. Forgac's affidavit asserts that Plaintiff suffered from "stress, anxiety, and depression related to the April 29, 2004 work place incident," and that there are "safety issues which have not been addressed," not surprisingly, it contains no specifics going to the first three elements of Plaintiff's claim. Because Plaintiff has failed to present evidence that DaimlerChrysler intended to cause her emotional distress, engaged in "extreme and outrageous" conduct, or caused severe emotional distress, DaimlerChrysler is entitled to summary judgment on Plaintiff's intentional infliction of emotional distress claim.

*D. Wrongful Termination in Violation of Public Policy*

■ The Ohio Supreme Court, in *Greeley v. Miami Valley Maint. Contractors, Inc.,* 49 Ohio St.3d 228, 551 N.E.2d 981 (1990), recognized that public policy warranted an exception to the doctrine of employment-at-will, and that an employee terminated in violation of a statute could sue her employer in tort for wrongful discharge in violation of public policy. *Greeley,* 551 N.E.2d at 986–87. Such claims came to be called "*Greeley* claims." *See, e.g., Kulch v. Structural Fibers, Inc.,* 78 Ohio St.3d 134, 677 N.E.2d 308, 319–20 (1997). *Greeley* claims may be premised on the violation of a "clear public policy," whether the source of the policy is a statute or another source. *Id.* at 321.

■ The elements of a *Greeley* claim were adopted by the Ohio Supreme Court

in reliance on the analysis of Professor H. Perritt. *Id.* To establish a cause of action for wrongful discharge in violation of public policy, a plaintiff must show that: (1) a clear public policy existed (the "clarity" element); (2) dismissal of employees in circumstances like the plaintiff's would jeopardize the public policy (the "jeopardy" element); (3) the employer's dismissal of the plaintiff was motivated by conduct related to the public policy (the "causation" element); and (4) the employer lacked an overriding business justification for the plaintiff's dismissal (the "overriding justification" element). *Id.* "Clarity" and "jeopardy" are questions of law; "causation" and "overriding justification" are generally questions of fact. *Id.*

■■■■■■ Plaintiff claims DaimlerChrysler constructively discharged her in violation of Ohio's public policy favoring workplace safety. The Court must first determine whether Plaintiff was constructively discharged. "Courts generally apply an objective test in determining when an employee was constructively discharged, *viz.*, whether the employer's actions made working conditions so intolerable that a reasonable person under the circumstances would have felt compelled to resign." *Mauzy v. Kelly Servs.*, 75 Ohio St.3d 578, 664 N.E.2d 1272, 1280–81 (1996). "In applying this test, courts seek to determine whether the cumulative effect of the employer's actions would make a reasonable person believe that termination was imminent." *Id.* at 1281. " 'Part of an employee's obligation to be reasonable is an obligation not to assume the worst, and not to jump to conclusions too fast.' " *Mayo v. Kenwood Country Club*, 134 Ohio App.3d 336, 731 N.E.2d 190, 194 (1999) (quoting *Garner v. Wal–Mart Stores, Inc.*, 807 F.2d 1536, 1539 (11th Cir.1987)). "When an employee alleges that he was forced to resign, the employee's perception must be judged objectively without consideration of his undue sensitivities." *Wilson v. Firestone Tire & Rubber Co.*, 932 F.2d 510, 515 (6th Cir.1991) *quoted with approval in Mayo*, 731 N.E.2d at 194.

■■■■ In response to DaimlerChrysler's summary judgment motion, Plaintiff states that she bases her claim that she was constructively discharged on "the employment problems that arose between February 1, 2004, and April 29, 2004," and on DaimlerChrysler's alleged failure to comply with its own safety and discipline procedures, as applied to the threats reported by Lobzun. Essentially, Plaintiff claims DaimlerChrysler forced her from her job by failing to provide a safe working environment. Here, there is no evidence that a reasonable person in Plaintiff's position would have felt compelled to resign or would have thought termination was imminent.

DaimlerChrysler investigated the incident in which a union steward screamed an insult at Plaintiff after she and he traded expletives, the incident in which another employee accused Plaintiff of pushing her, and the incident in which a supervisor allegedly overheard Lobzun say, "I'm going to get that bitch. She's going down and that stupid smiley face is going to get her in trouble." In each case, the company was unable to substantiate either side. In the first case, Plaintiff admitted that both parties behaved unprofessionally. In the second, the employee who accused Plaintiff of pushing her was disciplined for disobeying Plaintiff. In the third, when two witnesses failed to corroborate the supervisor's report, DaimlerChrysler documented the investigation. The Court fails to see how the company's actions relative to these incidents could reasonably make Plaintiff afraid for her safety or believe she was about to be terminated. Indeed,

Plaintiff continued working after those incidents and did not determine that her working environment was intolerably unsafe until after the April 29, 2004 meeting at which she learned of the fabricated threats Lobzun had reported.

DaimlerChrysler likewise took Lobzun's report of threats seriously and investigated it. As discussed above, there is no evidence that Lobzun herself ever actually threatened Plaintiff. Rather, Lobzun falsely reported to management that others had made veiled threats regarding Plaintiff. When this was discovered, Lobzun was counseled about lying, but was encouraged to report any actual threats she heard in the future. Plaintiff testified in her deposition that, at the LRT meeting on April 29, 2004, a member of Daimler-Chrysler management told her, and she believed, that the reported threats had never actually been made, but that Lobzun had made them up to get Plaintiff transferred to another work area.

This Court must judge Plaintiff's perception of her working conditions from an objective perspective, without regard to any undue or heightened sensitivities, and without assuming the worst or jumping to conclusions. Because Plaintiff knew Lobzun admitted the report of threats was false, Plaintiff's subsequent determination that her workplace was intolerably unsafe was unreasonable. Moreover, there was nothing on which Plaintiff could reasonably base a conclusion that her termination was imminent. The Court finds Plaintiff cannot show she was constructively discharged. Her *Greeley* claim cannot succeed for that reason.

However, even if Plaintiff could show she was constructively discharged, her *Greeley* claim would fail on its own merits. Plaintiff's insurmountable hurdle is not the clarity element: "Ohio public policy favoring workplace safety is an independent basis on which a cause of action for wrongful discharge in violation of public policy may be prosecuted." *Pytlinski v. Brocar Prods., Inc.*, 94 Ohio St.3d 77, 760 N.E.2d 385, 388 (2002). However, "the 'jeopardy' element does not state simply that the policy has been violated, but that the policy itself is at risk if dismissals like the one in question are allowed to continue." *Jermer v. Siemens Energy & Automation, Inc.*, 395 F.3d 655, 659 (6th Cir.2005). Therefore, "a plaintiff who cites workplace safety as the public policy satisfying the clarity element ... must have at least lodged complaints about workplace safety in order to satisfy the jeopardy element of the claim," and, furthermore, "the employee must at least have made clear to his employer that he is invoking a governmental policy as the basis for his complaint, not just his own self-interest." *Id.* at 658–59. Here, Plaintiff has presented no evidence that she lodged complaints about workplace safety in the name of governmental policy. She therefore cannot satisfy the jeopardy element. *Accord Aker v. New York & Co.*, 364 F.Supp.2d 661, 665–66 (N.D.Ohio 2005) (Carr, C.J.) (granting summary judgment in favor of the defendant where the plaintiff did not claim she was terminated for reporting unsafe conditions, but rather, claimed she feared for her own safety). In any event, Plaintiff has failed to present facts showing there was an actual workplace safety issue, or to identify what safety procedures DaimlerChrysler failed to follow. DaimlerChrysler is entitled to summary judgment on Plaintiff's *Greeley* claim.

**E. Disability Discrimination**

Plaintiff claims DaimlerChrysler violated Ohio Revised Code § 4112.02(A) by discriminating against her on the basis of disability. That statute makes it unlawful for an employer, "because of the ...

disability ... of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." To succeed on a disability discrimination claim under Ohio law, a plaintiff must show:

> (1) that he or she was handicapped, (2) that an adverse employment decision was taken by an employer, at least in part, because the individual was handicapped, and (3) that the person, though handicapped, can safely and substantially perform the essential functions of the job in question.

*City of Columbus Civ. Serv. Comm'n v. McGlone,* 82 Ohio St.3d 569, 697 N.E.2d 204, 206 (1998). As used in Ohio Rev.Code § 4112.02, " 'disability' means a physical impairment that substantially limits one or more major life activities, including ... working; a record of a physical or mental impairment; or being regarded as having a physical or mental impairment." Ohio Rev.Code § 4112.01(A)(13). Ohio courts "look to regulations and cases interpreting the federal [Americans with Disabilities] Act for guidance" in interpreting the Ohio law. *McGlone,* 697 N.E.2d at 206–07.

■ When "working" is the "major life activity" that the alleged impairment substantially limits:

> The term substantially limits means significantly restricted in the ability to perform either a *class of jobs* or a *broad range of jobs* in various classes compared to the average person having comparable training, skills and abilities. *The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.*

29 C.F.R. § 1630.2(j)(3)(I) (emphasis added). The inability to work with particular co-workers, even where doing so causes a mental or physical impairment, does not constitute a substantial limitation of the ability to work, because it does not restrict the ability to perform a broad class of jobs. *Cartwright v. Lockheed Martin Utility Servs., Inc.,* 40 Fed.Appx. 147, 154–55 (6th Cir.2002) (unpublished).

■ When the claimed adverse employment action is the failure to make a reasonable accommodation by transferring the plaintiff to another position, the Sixth Circuit has held that "[i]n order to establish a prima facie case of disability discrimination ... [a plaintiff] must show that he requested, and was denied, reassignment to a position for which he was otherwise qualified." *Burns v. Coca–Cola Enters.,* 222 F.3d 247, 258 (6th Cir.2000). A transfer requested so that the plaintiff will not be required to work with certain people is not a reasonable accommodation. *Coulson v. Goodyear Tire & Rubber Co.,* 31 Fed. Appx. 851, 858 (6th Cir.2002). Indeed, "[c]ourts are not meant to act as a super-bureau of Human Resources." *Id.*

■ Plaintiff has presented no evidence showing that her ability to perform a class of jobs or broad range of jobs is significantly restricted. The affidavits and reports of her doctors only address her ability to perform her specific job at DaimlerChrysler; they do not claim Plaintiff is unable to work in general. Indeed, after leaving her position at DaimlerChrysler, Plaintiff sought other jobs both within and outside of that company, and eventually planned, incorporated, built facilities for, and opened her own "doggy daycare" business. Because Plaintiff has no evidence her ability to work in a broad class of jobs is restricted, no jury could find her "disabled" under the Ohio Revised Code.

■ Moreover, even if Plaintiff could show she is "disabled," she cannot show

DaimlerChrysler took an adverse employment action. In her deposition, Plaintiff stated that the adverse employment action underlying her disability discrimination claim was DaimlerChrysler's denial of her claim for disability benefits. The Court is somewhat perplexed by the suggestion that the company denied Plaintiff's disability claim because she *was* disabled. In any event, there is no evidence to support such a claim. DaimlerChrysler claims its determination was based on Plaintiff's failure to present adequate evidence of total disability, and Plaintiff has presented no evidence of pretext.

In her Response, Plaintiff claims DaimlerChrysler failed to reasonably accommodate her disability by transferring Lobzun to another area or transferring Plaintiff to another area. However, Plaintiff admitted in her deposition that she never asked the company to transfer Lobzun. Moreover, she has identified no evidence showing that she was qualified for the positions she herself applied to transfer into. In any event, as in *Coulson,* a transfer to avoid working around Lobzun would not be a reasonable accommodation.

DaimlerChrysler has not terminated Plaintiff, and, as explained above, she was not constructively discharged. Therefore, even if Plaintiff was "disabled," she cannot show DaimlerChrysler took an adverse employment action. For those reasons, DaimlerChrysler is entitled to summary judgment on Plaintiff's disability discrimination claim.

## F. ERISA

In Count Eight of her Second Amended Complaint, Plaintiff brings a claim premised on the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001–1461. She alleges that she was a member of an "employee benefit plan" as defined by ERISA, that she was entitled to

disability benefits under the plan, and that DaimlerChrysler improperly denied her claim for benefits. In the Complaint, Plaintiff first states she was disabled by severe emotional distress, then alleges that she has been disabled by "the serious nature of the threats made by Debra Lobzun and DaimlerChrysler's inability to deal with them properly." (Doc. No. 104, ¶ 55). Plaintiff concludes that "DaimlerChrysler's requirement that [she] be 100% disabled is contradictory [sic] by its own disability plan policy and violates the same. As a result, Defendant DaimlerChrysler breached its contract with Plaintiff regarding interpreting the disability plan, and Plaintiff has been damaged accordingly." *Id.* ¶ 57. The parties have filed cross-motions for summary judgment on Plaintiff's ERISA claim.

Plaintiff, in her motion for summary for summary judgment, quotes extensively from 29 U.S.C. § 1132(c), which relates to an ERISA plan administrator's liability for failure to provide certain required and requested information. However, Plaintiff neither alleges in her complaint nor presents evidence showing that she requested information about the plan and that the administrator failed to comply. Similarly, Plaintiff presents argument regarding a claim under 29 U.S.C. § 1132(a)(3) for a breach of fiduciary duty. However, such a claim is unavailable to Plaintiff because she may bring a claim under 29 U.S.C. § 1132(a)(1)(B) for denial of benefits. *Wilkins v. Baptist Healthcare System, Inc.,* 150 F.3d 609, 615–16 (6th Cir.1998). The Court will construe Plaintiff's ERISA claim as one brought under 29 U.S.C. § 1132(a)(1)(B).

DaimlerChrysler premises its motion for summary judgment in part on its argument that the plan at issue is not an "employee benefit plan" governed by

ERISA. The Court must first address this threshold issue.

### 1. *"Employee Benefit Plans" and Payroll Practices*

ERISA only applies to "employee welfare benefit plans" or "employee pension benefit plans," the latter of which is not applicable here. 29 U.S.C. §§ 1001(3), 1132(a). ERISA provides in relevant part that:

> The terms "employee welfare benefit plan" and "welfare plan" mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability....

29 U.S.C. § 1001(1). However, the Secretary of Labor has issued regulations excluding certain "payroll practices" from the above definition:

> [T]he terms "employee welfare benefit plan" and "welfare plan" shall not include—Payment of an employee's normal compensation, out of the employer's general assets, on account of periods of time during which the employee is physically or mentally unable to perform his or her duties, or is otherwise absent for medical reasons (such as pregnancy, a physical examination or psychiatric treatment).

29 C.F.R. § 2510.3–1(b)(2). The Supreme Court's explanation of the purpose of ERISA in a case holding the statute does not apply to vacation benefits payable from the employer's general fund is instructive here:

In enacting ERISA, Congress' primary concern was with the mismanagement of funds accumulated to finance employee benefits and the failure to pay employees benefits from accumulated funds. To that end, it established extensive reporting, disclosure, and fiduciary duty requirements to insure against the possibility that the employee's expectation of the benefit would be defeated through poor management by the plan administrator. Because ordinary vacation payments are typically fixed, due at known times, and do not depend on contingencies outside the employee's control, they present none of the risks that ERISA is intended to address. If there is a danger of defeated expectations, it is no different from the danger of defeated expectations of wages for services performed—a danger Congress chose not to regulate in ERISA.

*Massachusetts v. Morash*, 490 U.S. 107, 115, 109 S.Ct. 1668, 104 L.Ed.2d 98 (1989).

■ It is undisputed in this case that the plan at issue, DaimlerChrysler's "Disability Absence Plan," ("DAP") pays totally disabled employees their full pay for approximately nine months, and seventy percent of their pay for approximately three more months. It is likewise undisputed that payments under the DAP are made from the company's general fund. The DAP therefore meets the definition of a "payroll practice" excluded by regulation from ERISA's coverage.

Plaintiff's argument that ERISA applies is based on her claim that DaimlerChrysler held out the DAP to its employees as an ERISA plan. Plaintiff is indeed correct that DaimlerChrysler's "Life and Disability Program" Summary Plan Description ("SPD") provides indications from which an employee might conclude the company represented the DAP to be an "ERISA

plan." First, in the introduction, the SPD includes the DAP in its description of "group insurance" benefits: "The *group insurance program* provides group life insurance, permanent total disability benefit, accidental death and personal loss, *disability absence plan benefit,* and long-term disability benefit." (Doc. No. 74, p. DC–327) (emphasis added). Then, in the section entitled "Applying for *Group Insurance Benefits,*" the amended text provides, without excluding DAP benefits or otherwise limiting the plans to which the section refers, that employees whose appeals are denied may bring a civil action under ERISA. (Doc. No. 74, pp. DC–347 to DC–348; Doc. No. 87, pp. DC–439 to DC–40). Finally, near the end of the booklet, immediately after a section setting forth the "Administration Information" for each plan, including the DAP, the SPD provides, "These Plans are designed to meet the legal requirements for employee benefit plans established by the Employee Retirement Income Security Act of 1974 (ERISA)." (Doc. No. 74, p. DC–378). The administrative information for the DAP appears last in the list, immediately before the ERISA notice.[1]

However, the regulatory exemption for "payroll practices" draws no distinction between plans that otherwise meet its criteria and that are held out as ERISA plans, and those that are not. No published Sixth Circuit case has relied on the fact that an employer "held out" a plan as covered by ERISA to conclude that the "payroll practices" exemption did not apply. In fact, the Court has been unable to find any case relying *solely* on the fact that an employer represented a plan to be covered by ERISA to find the "payroll prac-

tice" exemption inapplicable, where its criteria are otherwise met.

The Court has found two cases in which the respective courts considered the degree to which the employer had held out the plan as one covered by ERISA in their discussions of whether the "payroll practice" exemption applied. *See Capriccioso v. Henry Ford Health Sys.,* 225 F.3d 658, 2000 WL 1033030, at *3 (6th Cir.2000) (unpublished); *McMahon v. Digital Equip. Corp.,* 998 F.Supp. 62, 67 (D.Mass. 1998) ("*McMahon II*") (citing *McMahon v. Digital Equip. Corp.,* 944 F.Supp. 70, 73 n. 4 (D.Mass.1996) ("*McMahon I*")). Both cases treated "holding out" as, at most, merely one "consideration" in the larger "payroll practices" inquiry. Neither relied solely upon the employer's label for the plan.

In *Capriccioso,* the plaintiff claimed his employer failed to pay him short-term disability benefits pursuant to a policy under which the employer paid full salary benefits for the first six months of disability, and thirty percent of the disabled employees' salary for the next six months. *Capriccioso,* 225 F.3d 658, 2000 WL 1033030, at *1. Finding the plan met the requirements of 29 C.F.R. § 2510.3–1(b)(2), the court determined it was a "payroll practice" exempt from ERISA. After so holding, and without citing any authority for doing so, the court considered the plaintiff's contention that the employer had held out the plan as an ERISA benefit. *Id.* at 225 F.3d 658, 2000 WL 1033030, *3. The court rejected the contention, finding no evidence the employer had labeled the short-term disability benefit as an ERISA plan, nor that it had filed documents with the Department of Labor representing the

---

1. Defendant has moved to strike the documents Plaintiff has submitted containing the amendments to the SPD; however, the Court would find there is evidence from which a jury could conclude the SPD intimated the DAP was an ERISA plan even absent the amended text.

plan as such. *Id.* at 225 F.3d 658, 2000 WL 1033030, *3. It is unclear what the impact of a contrary finding on the court's decision would have been.

In *McMahon I*, the Massachusetts district court enumerated the requirements set forth in 29 U.S.C. § 2510.3–1(b)(2), then explained that "[r]eference to these criteria is made here not to limit the Court to factors it may later consider in determining whether the STD Plan in fact is a 'payroll practice,' but rather to indicate what types of allegations are relevant to establishing a cause of action for violation of a payroll practices plan." *McMahon I*, 944 F.Supp. at 73. In a footnote, the court explained that "[o]ther factors, for example, are the degree to which [the employer] held out the STD Plan to its employees or others as an ERISA-covered plan, and the extent to which [the employer or the administrator] kept records and otherwise administered the STD Plan consistent with ERISA's requirements." *Id.* at 73 n. 4 (citing *Toledo v. Ayerst–Wyeth Pharm., Inc.*, 852 F.Supp. 91, 98 (D.P.R.1993)). The court's reliance on *Toledo v. Ayerst–Wyeth Pharmaceutical, Inc.* seems misplaced: the cited portion of that case contains a discussion of whether certain plans met the definition of an "employee welfare benefit plan" under 29 U.S.C. § 1001(1), not whether plans, having met that definition, are removed from ERISA's purview by the "payroll practice" exemption. *Toledo*, 852 F.Supp. at 98. While the employer's characterization of the plan as one covered by ERISA is relevant to the former determination, *Toledo* does not purport that it is relevant to the latter. *See id.* at 98–99.

In *McMahon II*, the Massachusetts district court applied its formulation of the "payroll practice" exemption from *McMahon I*, finding the exemption did not apply to the plan at issue. *McMahon II*, 998 F.Supp. at 65, 67–68. The court so found because the plan was funded in part by an insurance contract, rather than the employer's general fund, as required by the regulation, but also because the employer had filed two Internal Revenue Service Forms 5500, as required by ERISA, and because the employer "treated the plan as one covered by ERISA and assured employees they were entitled to ERISA's protections." *Id.*[2] Though the Massachusetts court deemed the characterization of the plan "more significant" than the source of its finding, this Court believes that conclusion is based on a flawed reading of the *Toledo* case.

While the District Court for the Western District of Tennessee also had occasion to consider the description of a plan in *Williams v. Great Dane Trailer Tennessee, Inc.*, it did so only because the plaintiff in that case argued the employer's short-term disability benefit was "part of" its ERISA-covered health insurance program. *Williams v. Great Dane Trailer Tenn., Inc.*, No. 94–2189–G/A, 1995 WL 447268, at *2, 1995 U.S. Dist. LEXIS 22152, at *5–6 (W.D.Tenn. Jan. 20, 1995). The court examined the plan document, in which it found no indication the health plan provided a short-term disability benefit. *Id.*

On the other side of the coin, the Eleventh Circuit has held that, "even if [the employer] has treated the Program as an ERISA plan with respect to government filings, its mere labeling of the plan should not determine whether ERISA applies. Allowing this could lead to a form of 'regulation shopping.'" *Stern v. IBM*, 326 F.3d

---

**2.** In this case, Plaintiff has presented no evidence that DaimlerChrysler filed a Form 5500 for the DAP.

1367, 1374 (11th Cir.2003). The court concluded that where a plan meets the criteria set forth in 29 C.F.R. § 2510.3–1(b)(2), it is a "payroll practice" exempted from ERISA's coverage.

The District Court for the Northern District of Illinois has come to the same conclusion:

> Plaintiff's remaining contention is that the STD plan should be considered an ERISA plan because defendants indicated it was by referring to it as a welfare benefit plan, representing that it had a summary plan description, and including it in the Form 5500 filing. Plaintiff cites no case law or regulation supporting that such conduct is a basis for treating as a plan a practice that otherwise satisfies the payroll practice exception.... Since defendants satisfied the requirement for a payroll practice, the STD plan was a payroll practice, not an ERISA plan.

*Havey v. Tenneco, Inc.,* No. 98 C 7137, 2000 WL 198445, at *8, 2000 U.S. Dist. LEXIS 1694, at *25–26 (N.D.Ill.2000) (internal citations omitted).

Due to the lack of any binding or persuasive authority indicating that an employer's labeling of a plan as one covered by ERISA is relevant to the determination of whether the plan is removed from ERISA's coverage by the "payroll practice" exemption of 29 C.F.R. § 2510.3–1(b)(2), the Court finds Plaintiff's claim that DaimlerChrysler held out the DAP as an ERISA plan is inapposite. Because the DAP provides for "payment of an employee's normal compensation, out of the employer's general assets, on account of periods of time during which the employee is physically or mentally unable to perform his or her duties," it is a "payroll practice" to which ERISA does not apply. DaimlerChrysler's inclusion of the DAP in its description of the type of plans covered by ERISA does not remove the DAP from the exemption for "payroll practices." As a final note, the Court observes that this holding does not compromise ERISA's purpose, which, as explained above, is to protect employees from the mismanagement of insurance funds. No such fund is involved here.

## *2. Plaintiff's Denial of Benefits Claim*

■ Even if ERISA did apply to the DAP, Plaintiff's denial of benefits claim would fail on its merits, because DaimlerChrysler's decision to deny benefits was not arbitrary and capricious. Where an ERISA plan grants its administrator "discretionary authority to determine eligibility for benefits or to construe the plan's terms," the administrator's denial of benefits is reviewed under the "arbitrary and capricious" standard. *Marquette Gen. Hosp. v. Goodman Forest Indus.,* 315 F.3d 629, 632 (6th Cir.2003). This deferential standard "requires [the Court] to uphold a benefits determination if, in light of the plan's provisions, it is rational." *Id.* This Court's review is limited to the administrative record as it existed when the administrator issued its final decision upholding the denial of benefits. *Moon v. Unum Provident Corp.,* 405 F.3d 373, 378 (6th Cir.2005).

> DaimlerChrysler's SPD provides that:
> The Plan Administrator has the sole and absolute discretionary authority to interpret, and to make determinations with regard to the terms, conditions or administration of the Plan, including, but not limited to issues regarding conflicting provisions, doubtful terms, and the determination of claims or eligibility for benefits. The Plan Administrator's decisions will be final and binding on all persons.

(Doc. No. 74, p. DC–378). The "arbitrary and capricious" standard therefore applies.

To be eligible for DAP benefits, an employee must:

Be disabled because of personal illness or injury after [having] one or more months of continuous service with DaimlerChrysler Corporation;

Be unable to perform all duties of [his] occupation;

Be under the continuous care of a legally qualified physician who certifies [his] disability; and

Furnish notice of claim and satisfactory proof of disability on a timely basis as explained [in the SPD].

(Doc. No. 74, p. DC–342). The SPD defines "physician" as "only a doctor of medicine (M.D.) or osteopathy (D.O.)." (Doc. No. 74, p. DC–333). DaimlerChrysler rejected Plaintiff's claim because it determined she failed to show she was unable to perform all duties of her occupation, failed to show she was under the continuous care of a legally qualified physician, and had not provided satisfactory proof of a disability.

The administrative record contains statements from plaintiff's primary care physician, Dr. Gross, and from a psychiatrist, Dr. Sherman, both doctors of medicine. Dr. Gross reported that Plaintiff was disabled through May 31, 2004, due to "stress" and "depression," triggered by "acute stresses" and "threats at work." She reported that Plaintiff suffered from "depressed mood or loss of interest/pleasure in activities," "marked anxiety, hypervigilance," and "recurrent thoughts/images of traumatic event," and had "confronted a threat to well being of self or others." (Doc. No. 87, p. DC–196 to DC–197). Dr. Gross's stated findings warranting total disability were "inability to focus, concentrate." *Id.* at DC–198. Dr. Gross's treatment plan was medication and an unspecific referral for counseling. Dr. Gross saw Plaintiff no more than once a month. Dr. Sherman saw Plaintiff once, did not in-

clude a diagnosis, and referred Plaintiff to a psychologist, Dr. Forgac. Though Plaintiff attempts to introduce material outside the administrative record, she identifies no other parts of that record in support of her motion or in opposition to DaimlerChrysler's.

DaimlerChrysler's conclusion that Plaintiff was not unable to perform all of the duties of her occupation was not irrational. The company could reasonably construe "occupation," which is not defined in the SPD, to mean the class of jobs into which Plaintiff's position falls, and could rationally conclude that Dr. Gross's statement that Plaintiff suffered from stress and depression did not preclude her from performing every duty of a job in her field. Even if "occupation" was construed to refer only to Plaintiff's actual job, DaimlerChrysler could rationally conclude that Plaintiff's stress and depression did not render her unable to perform all duties of that particular job, even if Dr. Gross's statement was read to indicate Plaintiff's stress was triggered by Debra Lobzun. Dr. Gross listed no "functional limitations" on her form. Likewise, the conclusion that the statement did not contain satisfactory "proof" of disability was rational: Dr. Gross's two- and three-word answers to questions on the statement form provided little explanation as to exactly how Plaintiff's stress and inability to focus affected her work, or what tests had been conducted to make the diagnosis.

Finally, DaimlerChrysler rationally concluded Plaintiff was not under the continuous care of a legally qualified physician. Dr. Forgac, a psychologist, does not meet the definition of "physician," and Plaintiff saw Dr. Gross monthly, at most. The construction of "continuous treatment," an amorphous requirement at best, as requiring more than monthly consultations is not patently irrational. Therefore, the Court

finds DaimlerChrysler's denial of Plaintiff's DAP claim was not arbitrary and capricious.

### G. Breach of Contract

■ Plaintiff amended her complaint to include a claim for breach of contract, presumably referring to the Life and Disability Program description. This claim is necessarily plead in the alternative to Plaintiff's ERISA claim. *Ramsey v. Formica Corp.*, 398 F.3d 421, 424–25 (6th Cir. 2005) (ERISA preempts claims for breach of contract that are based on the denial of benefits allegedly due under an ERISA plan). Absent evidence to the contrary, an employment relationship is presumed to be terminable by either party, "at will." *Mers v. Dispatch Printing Co.*, 19 Ohio St.3d 100, 483 N.E.2d 150, 153 n. 1 (1985). Here, Plaintiff has presented no evidence showing that her employment relationship with DaimlerChrysler was other than "at will." Therefore, the Court must consider whether the benefit plan description itself created a binding contract between the parties.

■ To prove the existence of a contract, "the plaintiff must show the elements of mutual assent (generally, offer and acceptance) and consideration. The plaintiff must also show that there was a 'meeting of the minds' and that the contract was definite as to its essential terms." *Nilavar v. Osborn*, 127 Ohio App.3d 1, 711 N.E.2d 726, 732 (1998) (internal citations omitted). As to definiteness, "a contract is illusory ... when by its terms the promisor retains an unlimited right to determine the nature or extent of his performance; the unlimited right, in effect, destroys his promise and thus makes it merely illusory." *Century 21 Am. Landmark, Inc. v. McIntyre*, 68 Ohio App.2d 126, 427 N.E.2d 534, 537 (1980); *see also G & J Pepsi Cola Bottling, Inc. v.*

*Limbach*, 48 Ohio St.3d 31, 548 N.E.2d 936, 939 (1990) ("[T]he agreement to purchase a 'sufficient supply' of Pepsi products and to keep the equipment 'well stocked' does not constitute consideration. Such an agreement is not an output or requirement contract and, therefore, the covenant may not be enforced or damages sought for its breach. The agreement is illusory."); *Kulas v. Bank One Trust Co., N.A.*, 2002 WL 31087007, at *5–6, 2002 Ohio App. LEXIS 4966, at *16 (Ohio Ct. App. Sept. 19, 2002) (holding a contract was illusory where the defendant reserved the right to modify, amend, or terminate the plan at any time, and to disavow any obligation to pay). Here, Plaintiff cannot show there was consideration or that the contract was definite as to its essential terms.

Plaintiff has presented no evidence that DaimlerChrysler's employees pay a premium for the disability plan or that any money is deducted from their salaries to pay for it. Rather, the plan provides for continued salary payments while the recipient is disabled, paid for (as when the employee is working) out of the company's general fund. Plaintiff has therefore provided no consideration. *See, e.g., Cooper v. Broadspire Sers., Inc.*, No. 04–5289, 2005 WL 1712390, at *3–4, 2005 U.S. Dist. LEXIS 14752, at *8–9 (E.D.Pa. July 20, 2005) ("The short-term disability program is a payroll practice maintained pursuant to 29 C.F.R. § 2510.3–1(b), and IBC's employees pay no premium for the benefit and no monies are deducted from their pay to cover the cost of the benefit. The program is thus an employee benefit that is not based on a contractual agreement between IBC and its employees.")

Moreover, the terms of the purported contract are not definite. First, it should be noted that the plan description sets forth the requirements for *eligibility* for

benefits, not requirements for an *entitlement* to benefits. Determination of a claimant's entitlement to benefits is left to the sole discretion of DaimlerChrysler. However, even the terms concerning eligibility, which require employees to provide "satisfactory proof of disability," lack the definiteness necessary for enforcement. Finally, as in *Kulas,* the plan description reserves to DaimlerChrysler the right to amend, suspend, or terminate the plan without the consent of any employee.

Because Plaintiff has not shown that she provided consideration, and because the terms of the purported contract are not definite, Defendant is entitled to summary judgment on Plaintiff's breach of contract claim.

*H. Motion to Strike*

Because the Court grants Defendants' summary judgment motions and denies Plaintiff's, DaimlerChrysler's motion to strike Plaintiff's motion and its attachments is denied as moot.

CONCLUSION

For the foregoing reasons, Defendant DaimlerChrysler's Motion for Summary Judgment (Doc. No. 70) and Supplemental Motion for Summary Judgment (Doc. No. 101), and Defendant Debra Lobzun's Motion for Summary Judgment (Doc. No. 71) are granted. Plaintiff Brenda Langley's Motion for Partial Summary Judgment (Doc. No. 87) is denied. DaimlerChrysler's Motion to Strike Plaintiff's Motion for Summary Judgment, Supporting Memorandum, and Attachments (Doc. No. 103) is denied as moot.

IT IS SO ORDERED.

*JUDGMENT ENTRY*

For the reasons stated in the Memorandum Opinion filed contemporaneously with this entry, IT IS HEREBY ORDERED,

ADJUDGED and DECREED that Defendant DaimlerChrysler's Motion for Summary Judgment (Doc. No. 70), Defendant DaimlerChrysler's Supplemental Motion for Summary Judgment (Doc. No. 101), and Defendant Debra Lobzun's Motion for Summary Judgment (Doc. No. 71) are granted.

FURTHER ORDERED that Plaintiff Brenda Langley's Motion for Partial Summary Judgment (Doc. No. 87) is denied.

FURTHER ORDERED that Defendant DaimlerChrysler's Motion to Strike Plaintiff's Motion for Summary Judgment, Supporting Memorandum, and Attachments (Doc. No. 103) is denied as moot.