[Cite as *Zwiebel v. Plastipak Packaging, Inc.*, 2013-Ohio-3785.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
### SHELBY COUNTY

MARK ZWIEBEL,

      PLAINTIFF-APPELLANT/                  CASE NO.  17-12-20
      CROSS-APPELLEE,

      v.

PLASTIPAK PACKAGING, INC., ET AL.,

                                   O P I N I O N

      DEFENDANTS-APPELLEES/
      CROSS-APPELLANTS.

Appeal from Shelby County Common Pleas Court
Trial Court No. 11CV000225

**Judgment Affirmed**

**Date of Decision:  September 3, 2013**

APPEARANCES:

     *David A. Young and Kami D. Brauer* for Appellant, Cross-Appellee

     *Deirdre G. Henry and J. Quinn Dorgan*  for Appellees,
          Cross-Appellants

**WILLAMOWSKI, J**.

{**¶1**} Plaintiff-Appellant, Mark Zwiebel ("Zwiebel"), appeals the judgment of the Shelby County Court of Common Pleas granting summary judgment in favor of Defendants-Appellees, Plastipak Packaging, Inc. and Rick Naegele (collectively hereinafter, "Plastipak") on his wrongful termination claim. On appeal, Zwiebel contends that the trial court erred in granting summary judgment when it found that he had failed to set forth a cause of action for wrongful discharge in violation of public policy. Plastipak has also filed a cross-appeal and raised three assignments of error. For the reasons set forth below, the judgment is affirmed.

{**¶2**} Zwiebel began working for Plastipak in 1985, when he was eighteen years old. At the time of his termination in 2011, Zwiebel was working as a production technician and was responsible for operating blow-molding machinery in the beverage department. Rick Naegele was Zwiebel's intermediate supervisor, a cell leader. Generally, each line of machines molds, labels and packages bottles that will be used to contain various food and beverage products. Zwiebel's job was to have hands-on operation of his assigned lines.

{**¶3**} Plastipak terminated Zwiebel on January 4, 2011, for incidents that occurred on December 30, 2010. Plastipak claims that Zwiebel, an "at-will" employee, was fired because he left his position on the factory line without

ensuring that someone was there to cover for him. In fact, Plastipak claims that Zwiebel did this three times on the same shift: once, when he left to use the restroom; once when he left for lunch (during which time the machine jammed, causing approximately 100 bottles to fall and become contaminated); and again later in the day, when he left to take a break. Plastipak also maintains that it had no choice but to terminate Zwiebel because he had already received a "first and final communication" in March of 2010, for falsifying a report on a leak detector. A "communication" is a disciplinary action and, because of the seriousness of the 2010 offense, Zwiebel was subject to termination for any other workplace violation that might occur in the succeeding twelve months. Zwiebel acknowledged that he received this communication and that he understood its significance.

{¶4} Zwiebel asserts that he tried to find someone to cover for him when he went to the restroom but that he was not able to locate anyone to watch his line. He also claims that no official policy existed that would instruct a technician as to what he or she should do if they needed to use the restroom and that, in the past, he claims that he was not always required to find coverage when he left his line to use the restroom. Zwiebel's position is that his termination was against the public policy which requires employers to permit employees to use restroom facilities,

subject to reasonable restrictions. He also maintains that his line leader had agreed to keep an eye on his line for him when he went to lunch.

{¶5} On December 30, 2010, Zwiebel clocked in at 7:10 for his twelve-hour shift. Employees who work twelve-hour shifts are entitled to take a 40 minute unpaid lunch break and three 10-minute paid breaks throughout the day. Although Zwiebel had operated most of the machines in his area of the factory, he was usually assigned to operate the blow molder located on Line 15. However, on this day, Zwiebel was assigned to run a newer Sidel blow molder located on Line 70, even though he had never previously operated this machine or received any training on it.

{¶6} At approximately 10:30 a.m., after working for over three hours without a break, Zwiebel needed to use the restroom. Because this was the first time he had operated Line 70 by himself, he looked for someone to watch his line while he used the restroom, but he claimed that he could not locate anyone. Therefore, Zwiebel, left the line for 3-5 minutes to use the restroom.

{¶7} When Zwiebel returned to Line 70, area leader Pemberton Lincoln and maintenance worker Alan Theison were waiting for him at Line 70, and were not happy that he had left his line unattended and without informing anyone. Theison asked Zwiebel where he had been and Zwiebel stated that he had gone to the restroom. Theison responded, "You walked off the f***ing line to go to the

restroom!" Zwiebel then turned to Lincoln, his area leader,[1] and complained that he had been placed on Line 70 by himself without any utility workers, technicians, or anyone else to assist him and without any training. Lincoln was upset that Zwiebel had left his line unattended and reprimanded Zwiebel for leaving his machine without any coverage. (Zwiebel Depo. 94; Lincoln Depo. 18-20)

{¶8} Later, Zwiebel took a 10-minute break at approximately 11:00 and a co-worker relieved him during this break. At approximately 11:30 a.m., Zwiebel shut down Line 70 and worked at his usual machine on Line 15.

{¶9} At 2:30 Zwiebel was ready to go to lunch. He walked to Line 62 and stated to his line leader, Loretta Lowe, "I'm ready to go to lunch. Can you keep an eye on my line?" (Zwiebel Depo. 97, 99-100). Lowe responded that she was already watching two other lines at the time. (Lowe Depo. 12, 21) She testified that she did not tell him that he could not leave nor did she specifically state that she could not watch his line. (*Id.* at 12) There have been other times when she had watched three lines. (*Id.*) Zwiebel testified that he told Lowe that his line was already up and running and that all she had to do was keep an eye on it. He claims that she then said, "Go ahead and go to lunch." (Zwiebel Depo. 100)

---

[1] Lincoln had approximately one-hundred technicians under his supervision. The technicians reported to their immediate supervisor, designated a line leader; the line leaders reported to one of four cell leaders; and the cell leaders reported directly to the area leader. Zwiebel's line leader was Loretta Lowe, who reported to cell leader Naegele, who reported to area leader Lincoln.

{¶10} Naegele testified that Lowe had informed him that Zwiebel did not ask permission to go to lunch, but that he simply *told* Lowe he was leaving and then went to lunch. (Naegele Depo. 34). When Naegele informed Lincoln that Zwiebel had left his machine unattended again, Lincoln spoke with Lowe and claimed that Lowe said she was already watching two machines and she told Zwiebel that she could not watch his machine at that time. (Lincoln Depo. 27; Lincoln Affidavit ¶ 9, Ex. 9)

{¶11} That afternoon, Lincoln asked Naegele to send a "Communication Request" to Human Resources ("HR"), which was the procedure that was followed in order to have HR issue a formal communication.[2] In the area on the form for "Suggested Action," Naegele wrote "Whatever is appropriate for this violation according to his past history." At this point in time, Naegele and Lincoln claimed they were not aware of the fact that Zwiebel already had another final communication in his record. In fact, an HR assistant had sent an email stating this was the first communication.

{¶12} Later that same day, Naegele sent an email to Lincoln describing what he observed when Zwiebel took a break later that day:

---

[2] Naegele's memo, requesting the communication stated in pertinent part: "Description of Violation: [Zwiebel] walked off machine and went to use the restroom without notification to leadership on L-70 in a.m., was verbally counseled by P.H. Lincoln at that time. At approximately 2:15 same day he walked off L-15 and as he walked by T/L Loretta, he stated watch 15 for me I am going to lunch. She stated that she told him she was already working Sidel 62 and labeler and could not watch 15 as well, he kept walking and went to lunch anyway. While gone, the line crashed and caused in excess of 100 bottles to be dropped to the floor. * * * When asked upon return to work station he stated that he told Loretta he was going to lunch, he did not ask if he could go to lunch." (Naegele Depo. Ex. 2)

> Just wanted to let you know that [Zwiebel] walked off the line again for his last break at 5:15 pm. Did not tell anyone he was going, left four Utilities there by themselves.
>
> Not sure if he just doesn't understand or what, but after both of us speaking with him today about it, now it just seems like he just doesn't care what we say or think.
>
> Just wanted you to be aware of the fact that he did it again for the fourth time[3] in one shift.

(Naegele Depo Ex. 1) Naegele claimed that this last incident was not mentioned in the communication because it occurred after he had already sent his request for communication to HR.

{¶13} On January 4, 2011, HR issued the following "Communication to Associate:"

> Reason for Communication: This communication is being issued for failure to follow conduct policies as defined in the Plastipak Pkg. Associate Handbook. * * * As the Company seeks to maintain standards of associate conduct, you are being issued this communication for failure to follow orders or instruction of a Supervisor or any member of Supervision. On the morning of December 30, 2010 you walked off the machine you were working on and went to the restroom. You did not notify Leadership on Line 70 that you were leaving the Line. After this instance you were verbally counseled by the Manufacturing Leader. Later during the same shift you walked off Line 15, walked by the Team Leader and said to watch your Line you were going to lunch. The Team Leader replied that they could not watch the line at that time because they were already working Sidel 62 and the labeler [machine] and could not watch Line 15 as well. You kept walking and went to lunch anyway. While you were at lunch, Line 15 backed up due to a jammed bottle which caused over 100 bottles to be dropped to the

---

[3] Although there are some references to Zwiebel leaving "four" times, the record does not contain any evidence that there was a fourth occasion when he left his line without direct coverage.

floor until maintenance arrived and unjammed the bottle. You did not follow orders of the Production Manager or the Team Leader. Failure to follow orders or instructions of a Supervisor or any member of Supervision is subject to discharge.

\* \* \*

Action Taken: Due to already receiving a first and final communication and again violating Work Rules, Plastipak Packaging, Inc. has no other alternative than to terminate your employment.

(Naegele Depo. Ex. 4)

{¶14} A short meeting was held with Zwiebel and supervisory personnel, and Zwiebel was told that he was terminated and was asked to sign the communication. Naegele testified that Zwiebel did not ask any questions when given the opportunity and that he just walked out without really saying anything. (Naegele Depo. 50-51)

{¶15} During the next few days, Zwiebel made several phone calls and talked with Lowe and other personnel at Plastipak about what had occurred. Lowe testified that she discussed the matter with Zwiebel and attempted to contact the HR manager[4] to explain that she had never told anyone that Zwiebel had walked off the line without permission. (Lowe Depo. 14) She wanted to set the record straight and explain that she had never told Zwiebel that he should not go to lunch

---

[4] Jennifer McNutt was the HR Talent Manager at the time. She is no longer employed by Plastipak. Her assistant, Mindy Taylor, was deposed, but there is no testimony in the record from Ms. McNutt. Rick Naegele also left Plastipak a few months after Zwiebel's termination. However, since he is also a defendant in this case, his deposition was taken.

or that she could not watch his machine. (*Id.* at 15) However, the HR manager told Lowe that she could not talk about the matter with her because it was confidential. (*Id.*) Lowe stated that the HR manager did not give her any opportunity to discuss what had occurred. (*Id.*)

{¶16} On June 13, 2011, Zwiebel filed suit against Plastipak for wrongful termination in violation of public policy claiming that he was improperly terminated for using the restroom. Plastipak moved for summary judgment, asserting that Zwiebel was an at will employee subject to termination at the discretion of Plastipak and that his termination had nothing to do with the vindication of a public policy such that Zwiebel would have a claim for wrongful termination.

{¶17} The trial court granted summary judgment in favor of both Plastipak Packaging and Naegele on August 16, 2012. In its decision, the trial court rejected Zwiebel's contention that Ohio's public policy requiring employers to provide its employees with reasonable access to toilet facilities was jeopardized when Zwiebel was terminated. The trial court further held that the public policy at issue could not be jeopardized because Zwiebel had not complained to his employer prior to his discharge that it had engaged in conduct violating the public policy. The trial court reasoned that since Zwiebel had not complained about the

bathroom policy until after his termination, he was merely using this reason for his own self-interest in defending against his discharge.

{¶18} It is from this decision that Zwiebel now appeals, raising the following assignment of error for our review.

### Zwiebel's Assignment of Error

**The trial court erred when it held that: (1) a public policy requiring employers to provide to its employees reasonable access to toilet facilities is not jeopardized when an employer terminates an employee for using the restroom; and (2) an employee, like Zwiebel, must complain to his employer that it engaged in conduct that violated the public policy at issue to satisfy the "jeopardy" element of the claim of wrongful termination in violation of public policy.**

{¶19} Plastipak filed a Notice of Cross-Appeal, and sets forth the following three assignments of error in its cross appeal.

### Plastipak's Cross-Appeal

### Plastipak's First Assignment of Error

**Zwiebel cannot demonstrate that Plastipak unreasonably restricted its employees' access to the restroom, and thus his discharge cannot jeopardize public policy.**

### Plastipak's Second Assignment of Error

**Zwiebel cannot demonstrate that Plastipak fired him because of conduct that is protected by public policy.**

**Plastipak's Third Assignment of Error**

**There is no reasonable basis for holding Rick Naegele liable on Zwiebel's wrongful discharge claim or for awarding punitive damages against either defendant.**

*Zwiebel's Assignment of Error*

{¶20} In his assignment of error, Zwiebel contends that the trial court erred in granting summary judgment when it found that public policy was not jeopardized when an employer terminates an employee for using the restroom. And, he submits that the trial court erred by treating this as a "whistleblower" case and finding that Zwiebel failed to meet a "pre-requisite" of raising a complaint in order to satisfy the "jeopardy element" of a claim for wrongful termination. Zwiebel also asserts that there are disputes of fact which would preclude summary judgment and that there was no overriding business justification for his dismissal.

{¶21} Summary judgment is proper where: (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can reach but one conclusion when viewing the evidence in favor of the non-moving party, and the conclusion is adverse to the non-moving party. Civ.R. 56(C); *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 1996–Ohio–336. We review a decision to grant summary judgment de novo. *Doe v. Shaffer*, 90 Ohio St.3d 388, 390, 2000–Ohio–186.

**{¶22}** In Ohio, the employer-employee relationship is presumed to be "at will" and subject to termination by either party "for good cause, bad cause, or no cause at all," so long as the termination is not contrary to law. *Sutton v. Tomco Machining, Inc.*, 129 Ohio St.3d 153, 2011-Ohio-2723, ¶ 7, *citing Phung v. Waste Mgt.*, *Inc.*, 23 Ohio St.3d 100 (1986). Here, it is undisputed that Zwiebel was an at will employee. Therefore, unless a special provision of the law provides otherwise, he would have no cause of action, even if he was fired wrongly, mistakenly, or unfairly. *See id.*

**{¶23}** An at-will employee may have a claim, however, if his discharge contravenes "a clear public policy articulated in the Ohio or United States Constitution, federal or state statutes, administrative rules and regulations, or common law." *Dohme v. Eurand Am.*, *Inc.*, 130 Ohio St.3d 168, 2011-Ohio-4609, ¶ 11, *citing Painter v. Graley*, 70 Ohio St.3d 377, 1994-Ohio-334, paragraph three of the syllabus. Ohio refers to claims of wrongful discharge in violation of public policy as *Greeley* claims. *See Greeley v. Miami Valley Maint. Contractors, Inc.*, 49 Ohio St.3d 228 (1990). In *Greeley*, the Ohio Supreme Court acknowledged an exception to the employment-at-will doctrine and created a cause of action in tort for wrongful discharge in violation of public policy. *Klopfenstein v. NK Parts Industries, Inc.*, 171 Ohio App.3d 286, 2007-Ohio-1916, ¶ 12. This claim has four elements:

1.    That a clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the clarity element).

2.    That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element).

3.    The plaintiff's dismissal was motivated by conduct related to the public policy (the causation element).

4.    The employer lacked overriding legitimate business justification for the dismissal (the overriding justification element).

*Dohme*, 2011-Ohio-4609, ¶¶ 13-16 (internal citations and quotations omitted). The first and second elements present questions of law for a court to resolve, while the third and fourth elements generally present questions of fact, subject to ordinary principles of summary judgment. *Id.* at ¶ 9, *citing Collins v. Rizkana*, 73 Ohio St.3d 65, 69-70, 1995-Ohio-135.

{¶24} The parties agree with the trial court's holding that the first element has been found, identifying the public policy at issue in this case (the clarity element). Based on Occupational Safety and Health Administration ("OSHA") standards, the trial court found that "there is a public policy that requires the employer to make available toilet facilities, although reasonable restrictions may be placed on access." (Aug. 16, 2012 J.E. 4)  OSHA's sanitation regulation in 29 C.F.R. 1910.1419(C)(1)(i) states that "[e]xcept as otherwise indicated in this paragraph * * *, toilet facilities, in toilet rooms separate for each sex shall be

provided in all places of employment in accordance with Table J-1 of this section * * *." In a Memorandum dated April 6, 1998, OSHA explained that this regulation is intended to ensure that employees have prompt access to toilet facilities, but that employers may impose reasonable restrictions on toilet use. (4/6/98 Memorandum of Director John B. Miles, Jr. to OSHA Regional Administrators and State Designees.) The Memorandum further stated:

> Restrictions on access must be reasonable, and may not cause extended delays. For example, a number of employers have instituted signal or relief worker systems for employees working in assembly lines or in other jobs where any employee's absence, even for the brief time it takes to go to the bathroom, would be disruptive. * * *

(*Id.*)

{¶25} After acknowledging that a clear public policy requires Ohio employers to permit employees to use restroom facilities, subject to reasonable restrictions, the trial court addressed the second element, the jeopardy element. The trial court found that dismissing employees under circumstances like those involved in Zwiebel's dismissal would not jeopardize the public policy. We agree that there is nothing in the record that would indicate that Zwiebel's dismissal would jeopardize OSHA's policy provisions concerning reasonable access to restrooms.

{¶26} Zwiebel consistently frames his argument as stating that he was fired for going to the bathroom. However, the record clearly shows that he was fired

for leaving his line unattended, and also for failure to follow the orders or instructions of supervisors. The fact that he was using the restroom was irrelevant to management's decision. Zwiebel would not have been terminated if he had asked someone to watch his line for him while he was using the restroom. Also, Zwiebel would have been similarly disciplined if he had left his line unattended for any other purpose, i.e., to get a snack, make a phone call, etc. The fact that he just happened to be using the restroom when he was reported for leaving his line unattended, has nothing to do with jeopardizing the public policy concerning restroom usage. Zwiebel has never claimed that Plastipak was being unreasonable in expecting employees to find coverage when they left their machines or that Plastipak inappropriately limited employees' use of the restroom facilities.

{¶27} Lincoln's testimony in his deposition indicates he was concerned solely about the fact that Zwiebel had left his machine unattended; not about the fact that Zwiebel went to the bathroom:

> Q. And so when you went to see him, you were in effect disciplining him, correct?
>
> A. Yes.
>
> Q. And you were disciplining him because you were not pleased that he left the machine unattended, correct?
>
> A. Correct?

(Lincoln Depo. 19-20)

{¶28} Lincoln testified that he has never had to verbally discipline any other employee at Plastipak for using the bathroom without finding coverage. (Lincoln Depo. 24) In his 19 years at Plastipak, he was not aware of any individual who was terminated for reasons related to a break. (*Id.* at 48) Naegele also testified that he was not aware of any other occasions where a technician went to the bathroom without getting coverage. (Naegele Depo. 30) And, although Lincoln acknowledged that Plastipak did not have a *written* policy specifically concerning bathroom usage, both he and Naegele indicated that it was expected that a technician find coverage whenever he or she would need to leave the line.

{¶29} Furthermore, if that had been the only incident involving Zwiebel that day, it is not likely that he would have been terminated. After telling Zwiebel that he was never to leave a line unattended, both Naegele and Lincoln believed that Zwiebel had ignored that warning and had walked off his line at lunchtime without his line leader's permission while she was already busy watching two other lines. Zwiebel and Lowe dispute that this is what occurred. Whether or not there was a miscommunication, a misunderstanding, or the parties do not remember exactly what had happened, it is clear that it was the lunch incident that triggered the request for a communication to be issued.

> Q. * * * Now, if you look at number 11 in your affidavit, you told [Naegele] that based upon what happened at lunch, and since you had verbally warned him earlier in the day, [Naegele] should issue a written communication, correct?

A.  Correct.

* * *

Q.  So according to your affidavit, Mr. Zeiebel left on break in an unexcused fashion on two occasions that day, correct?

A.  Correct.

(Lincoln Depo. 31)

{¶30} The communication issued by HR clearly states that the reason for the communication was "you are being issued this communication for failure to follow orders or instruction of a Supervisor or any member of Supervision" and for walking away from his machine at lunchtime, after being "verbally counseled" earlier in the day.  Regardless as to whether or not this was an accurate reflection of what occurred, the fact that Zwiebel was using the bathroom was merely incidental to what occurred, and was not the reason why he was terminated. Furthermore, this communication would not have caused his termination if he had not already been on a "first and final" warning.

{¶31} As the trial court discussed in detail, Zwiebel had never complained about Plastipak's bathroom coverage policies in the past, nor did Zwiebel indicate that they were unreasonable or harmful to employees.  He also did not complain about the policy when he was reprimanded for leaving Line 70, and he did not bring up the matter even when he was issued the communication and terminated.

In fact, when he complained about his termination afterwards and made phone calls to various Plastipak personnel, the main complaint was centered around the fact that he believed the communication he received was incorrect because he believed he had received Lowe's permission to go to lunch.

**{¶32}** It was not until he filed suit that Zwiebel raised the matter of public policy concerning bathroom usage. The jeopardy element of a *Greeley* claim takes into account a plaintiff's conduct only to the extent necessary to determine whether it falls within the scope of conduct necessary to further the public policy at issue. *Himmel v. Ford Motor Co.*, 342 F.3d 593, 598-599 (6th Cir.2003). The fundamental purpose of a *Greeley* claim is to protect employees who seek to vindicate an important governmental policy; the claim does not exist to vindicate an employee's personal interest. *See Jermer v. Siemens Energy & Automation, Inc.*, 395 F.3d 655, 658 (6th Cir. 2005). As the trial court noted, a *Greeley* claim requires the plaintiff employee to show not just that a policy may have been violated for him, but also that the policy itself is at risk if the discharge of the employee is allowed to continue. *Langley v. Daimler Chrysler Corp.*, 407 F.Supp.2d 897, 909 (N.D.Ohio 2005).

**{¶33}** Moreover, because Ohio describes the jeopardy inquiry as a question of law for the court, at the summary judgment stage the jeopardy inquiry serves only to determine whether public policy would be jeopardized by permitting an

employer to dismiss an employee. *Id.* While there is a clear public policy in favor of allowing employees access to workplace restrooms, it does not support the proposition that employees may leave their tasks or stations at any time without responsibly making sure that production is not jeopardized. In recognition of an employer's legitimate interest in avoiding disruptions, there is also a clear public policy in favor of allowing reasonable restrictions on employees' access to the restrooms. We cannot say that Zwiebel was in the position of "someone who is vindicating a governmental policy" when Lincoln reprimanded him for leaving his machine unattended.

{¶34} Therefore, we find that the requirements of the jeopardy element were not met in this case. Although there may be genuine issues of material fact as to the causation and overriding justification elements, as these are often questions of fact for a jury, Zwiebel's claim that his termination jeopardizes public policy is just too tenuous, as a matter of law, to qualify as a *Greeley* claim under the jeopardy element.

{¶35} Zwiebel has pointed to disputed issues of fact in which he claimed that it had been his regular practice in the past to leave his line without finding someone to cover for him; that he was not disobeying his line leader when he left for lunch; that the manufacturing machines regularly had occurrences when they "crashed" and caused products to fall, without any consequences; and, that there

was not any overriding business justification for his dismissal. Viewing these facts within the parameters given for summary judgment, it might appear that Zwiebel's termination was unfair, arbitrary, extreme, and perhaps, unwarranted. However, there is nothing that precludes an employer from terminating an at-will employee under those circumstances. What we do not find in the record are any facts that would support his contention that his termination was in contravention of public policy or that the firing would jeopardize the public policy requiring employers to provide adequate restroom facilities and allow employees to use them, subject to reasonable restrictions. Therefore, Zwiebel's assignment of error is overruled.

*Plastipak's Cross Assignments of Error*

{¶36} Plastipak has acknowledged that it did not have to file a formal cross appeal because it did not seek to change any aspect of the judgment on appeal. (*See* Appellees'/Cross-Appellants' Brief, 3) Even without filing a cross-appeal, appellees may defend a trial court's judgment on alternative grounds not relied on by the trial court pursuant to App.R. 3(C)(2). And, R.C. 2505.22 permits the filing of assignments of error by an appellee who has not appealed, in the event that the trial court's decision is reversed. Based upon our disposition of Zwiebel's assignment of error resulting in an affirmance of the trial court's decision, Plastipak's errors are moot and need not be considered.

{¶37} Having found no error prejudicial to the Appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**ROGERS, J., concurs.**

**PRESTON, P.J., concurs in Judgment Only**

**/jlr**